Madden, Judge,
concurring in part and dissenting in part.
I disagree with that part of the decision and opinion which allows recovery of the $13,615 of increased wages paid by plaintiff by reason of raising wages ten cents an hour on October 18, 1933. I do not believe that this raise was a result of the enactment of the National Industrial Recovery Act, within the meaning of the 1938 statute under which this suit is brought.
The issue in this case, as I see it, is a fairly narrow one. It is whether Congress intended, in the 1938 Act, to compensate all contractors with the government for wage increases made by them after the date, June 16,1933, of the National Industrial Recovery Act, if their contracts had been entered into before August 10, 1933, by which date contractors were on notice so that they could estimate for higher wages when making their bids. I so state the issue because I see no substantial causal relation between the Recovery Act and the wage raise made here that would-not exist in any other case in which wages were raised during this period, unless the events in the other case took place in some remote part of the country where the Recovery Act had not been heard of.
The reason plaintiff raised its wages appears from the following testimony of plaintiff’s President, on examination by plaintiff’s counsel.
Q. What happened which brought about a raise in the rates? What compelled you to pay more than twenty-five cents ?
*135 A. When the N. I. R. A. was passed, all employers were sent copies of that agreement [the President’s Reemployment Agreement] to sign, and the agreements called that we would pay forty cents an hour. This building was still in its infancy as far as construction was concerned when the Act was passed; we had completed demolition and excavation and some of the foundation, but the bulk of the work was yet to be done.
We inquired as to whether or not there would be any way we could be compensated for this increase if we paid it; we thought it being an act of the United States Government and we 'working for the United States Government, and if they thought it was the thing to do, they should lead the way by increasing this work — or for them to make this increase. It took some time before we could find out just what it was they would do.
Along in August a lot of people had signed these things, and the}^ were reading about it in the papers,, and mere was agitation among the men that they wanted more than twenty-five cents, and we met and agreed to give them thirty-five cents.
Q. At that time what other contract was going on ?
A. John McShain was building the Naval Hospital on South Broad Street. He had the same kind of contract we had, as the record will indicate, and he was paying twenty-five cents an hour. I did not know until some time later that the Navy Department changed his contract from one or to the other and made it a P. W. A. contract; that required that he paid fifty cents an hour»
Q. What was the result of McShain paying fifty cents — what effect did that have on labor here in Philadelphia ?
A. That started all the rest of the fellows paying fifty cents, and we were paying twenty-five cents, and they threatened to quit, and we promised to pay them thirty-five cents.
Q. And then you continued paying thirty-five cents?
A. Yes; until we signed the N. R. A., when we increased it to forty cents.
Plaintiff asks us to assume that the fact that one contractor, McShain, on one job in a great center of population and industry like Philadelphia, raised the wages of common labor from twenty-five cents to fifty cents was the cause of the agitation and demand for higher wages and threatened strike of plaintiff’s workmen. Since, plaintiff argues, McShain raised his wages as a result of the National Industrial Recov *136 ery Act, then plaintiff raised its wages as- a result of that Act. But I am not willing to make the necessary assumption.’ I am judicially aware of the general situation throughout the country at the time and of the many and complex forces pushing toward a higher wage and price level. I am not convinced that something akin to what happened to plaintiff would not have happened even though the McShain wage .raise had not occurred. Plaintiff’s President’s own statement that the McShain raise “started all the rest of the fellows paying fifty cents, and we were paying twenty-five cents, and they threatened to quit, and we promised to pay them thirty-five cents” is not a statement of legal cause and legal effect, even if the factual accuracy of the statement be assumed. Why the “other fellows” followed the McShain lead, we are not told. It may have been the general influence of the publicity of the times and the urging of the government. It may have been that the cost of living had risen, so that the twenty-five cent wage would not purchase the necessities of life. It may have been a scarcity of labor in the market. It may have been that, though labor was plentiful, it was withheld from the market by organization and collective action. Whatever the intervening forces were, they seem to have impinged much more heavily on the “other fellows” who gave .a twenty-five cent raise, well beyond the N. R. A. minimum, than on plaintiff which gave a ten cent raise, which left its wages still below that minimum.
The situation, then, was as follows. The force of the Recovery Act operated upon McShain. It was transmitted through him to the “other fellows” upon whom, as we judicially know, all the other forces which from time to time cause wages to be raised and contractors’ estimates to be disappointed, were at the same time operating. From the “other fellows” this combination of forces impinged upon plaintiff ■so that when his workmen threatened to strike he raised their wages, not to the standard of McShain and the others of fifty cents, nor to the Recovery Act standard of forty cents, but to thirty-five cents. The decision of the court is that this raise was the result of the Recovery Act, within the meaning ■of the 1938 Act. It seems to me that all known standards of proximity and remoteness are thereby discarded and that the *137 1938 Act is, in effect, made to mean that whatever wage raises, came after the Recovery Act were the result of it, unless the circumstances were so extraordinary as to be unlikely of occurrence.
I think Congress did not mean to go so far in the Act of 1938. Section 4 provides:
This Act shall not be interpreted as raising any presumption or conclusion of fact or law but shall be held solely to provide for trial upon facts as may be alleged.
I think this means that a plaintiff must prove his case according to some known standard of proof; that res ipsa loquitur is not to be the rule; and that, of course, post hoe ergo propter hoe is not to be the rule.
In the discussion of the reasons why the 1938 Act was passed, the opinion of the court correctly says, inter alia:
In the administration of the act of 1934 for the settlement of claims by the Comptroller General many claims-of contractors for reimbursement for increased costs after August 10, 1933, as a direct result of the operation, the administration and effect of the National Industrial Recovery Act were denied because the contractors making the claims were unable to show that they had strictly complied with the President’s Reemployment Agreement or with an applicable code.
As I understand the history of the 1938 Act, it seemed unfair to Congress that the Comptroller General had, for example, excluded from relief under the 1934 Act contractors who had, so far as most of their work was concerned, complied, if in any particular they had violated the Recovery Act, and contractors who had in good faith attempted to comply, if in fact they fell short. I see no indication that Congress was moved by sympathy for contractors who had refused to comply, but who had nevertheless been compelled, by threats of strike, to make some adjustment in their wages. That the cases of partial or attempted but imperfect compliance were the ones whose equity appealed to Congress is shown by the proviso in Section 1 of the 1938 Act that:
* * * this section shall apply only to such contractors, including completing sureties and all subcontractors and material men, whose claims were presented *138 within the limitation period defined in Section 4 of the Act of June 16,1934.
This meant that no suit could be brought in this court under the 1938 Act, unless the claimant had filed his claim under the 1934 Act with the contracting department within six months after June 16,1934, or, at his option, within six months .after the completion of the contract, except in the discretion of the Comptroller General for good cause shown by the ■claimant. If Congress meant, by the 1938 Act, to give a cause of action to a contractor who had no semblance or color of a •claim under the 1934 Act, it was, in the same Act, creating a ■claim and outlawing it by a limitation of time long since expired. It was also doing the inequitable thing of giving ■enforceable rights to those persons who, though they had not even a color of right under the 1934 Act, had filed timely ■claims under that Act, while denying recovery to persons similarly or better situated who, recognizing that they had no right under the 1934 Act, had not made the apparently useless .gesture of filing a claim. This kind of unjust and accidental creation and denial of rights should not be attributed to Congress. The part of the claim here under discussion is an excellent example of what I mean. When plaintiff raised wages ten cents an hour it was not “complying” with the .Recovery Act, either actually, or even partially or colorably. It was refusing to comply with it and was saying that it would comply only when the Government agreed, in advance, to foot the bill. Yet it happened, probably because another part of its claim had apparent merit under the Act of 1934, to file a timely claim on April 1,1935, within six months after the complétion of the contract. Hence, although the Comptroller General could not possibly have allowed this part of its claim under the 1934 Act, plaintiff has the right to sue bere. But another contractor, similarly situated, who had given the same raise under the same circumstances, and who had not filed a claim in 1935 because he had no more color ■of right than plaintiff, would be barred by the limitation in the present Act.
The proper construction of the 1938 Act is not easy. From these several indications of the intent of Congress I would ■draw the conclusion that the purpose of the 1938 Act was *139 largely curative; that it was meant to authorize this court to overlook technical defects in compliance; to regard a bona fide though incomplete or mistaken move toward compliance as sufficient, fro tanto; to recognize such compliance as in fact occurred even if there was also some violation;
When one supposedly impelled by a force of an intangible nature such as the Eecovery Act has refused to give weight to that force, and when all the other palpable forces usually at work to produce a certain result are in action, and when the result produced is not even in accord with the objective of the intangible force, it is, it seems to me, a departure from logic and law to say that the result is produced by the intangible force. I do not believe that Congress intended that we should treat a wage raise as the result of the Eecov-■ery Act, when by all standards by which the law has been accustomed do ‘determine legal results, the Eecovery Act has not been proved to be the cause. I think that plaintiff’s ■claim for the ten-cent raise comes within neither the equity nor the language of the 1938 Act. I would, accordingly, ■dismiss it.